**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Richard Algie MISSICK, Defendant–Appellant.**

**No. 88–3095.**

United States Court of Appeals, Seventh Circuit.

Argued April 3, 1989.

Decided May 24, 1989.

Steven D. Allen, Indianapolis, Ind., for defendant-appellant.

Melanie Conour, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before BAUER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

Defendant Richard Algie Missick appeals from his convictions of conspiracy to import approximately eleven ounces of cocaine into the United States pursuant to 21 U.S.C. § 963 and possession of approximately one ounce of cocaine with the intent to distribute pursuant to 21 U.S.C. § 841(a)(1). The defendant was sentenced to imprisonment of ninety-six months on the first count and a concurrent term of twelve months imprisonment on the second count, with three years of supervised release on parole to follow. On appeal, defendant contends that the evidence presented at trial was insufficient to sustain the conviction and that District Judge Tinder erred in denying the defendant's motion to suppress tape-recorded evidence, warranting reversal of the judgment. Alternatively, defendant seeks remand for resentencing on the basis that the district court improperly departed from the Sentencing Guidelines. We affirm the conviction, but remand for resentencing in conformity with the Sentencing Guidelines.

## I.

Missick's indictment resulted from an investigation into drug trafficking based on information provided by Robert Jason Settles, who agreed to cooperate with the government upon his arrest on February 19, 1988. Settles testified that he began selling cocaine in 1984, obtaining his cocaine from local sources until 1987, when he began taking trips to the Bahamas to purchase the drugs from a source known as "Cecil". On one such trip on September 8, 1987, Settles was unable to meet with Cecil and was instead introduced to Missick by an individual named Frederick, a/k/a "Sleepy". Settles purchased approximately four ounces of cocaine from Missick at that time and observed approximately seven kilos of cocaine in Missick's possession.

Following the September trip, Settles made three more trips to the Bahamas to purchase cocaine from Missick in November and December of 1987 and February of 1988, the last of which resulted in his search and arrest by the U.S. Customs Service at the Indianapolis International Airport upon his return from the Bahamas on February 19, 1988. The government found approximately eleven ounces of cocaine in Settles' luggage. Settles informed the government and later testified that he purchased the cocaine from Missick in the Bahamas at the cement plant where Missick worked and that he informed Missick during the purchase that he would be bringing the cocaine into the United States.[1]

Settles further related that his trips were financed by David Jan Fluhr and Philip D. Whisner. Specifically, Whisner had given Settles $1,000 for the delivery of one ounce of cocaine from the September 1987 trip. Whisner and Fluhr each made the same financial arrangements for the November and December trips in 1987. For the February 1988 trip, Whisner provided Settles with his wife's credit card to purchase airfare for Settles and his girlfriend, Kimberly King, totaling $400, as well as $600 in cash in return for one ounce of cocaine. Fluhr advanced Settles $3,000 for which Fluhr was to receive three ounces of cocaine with profits from any remaining purchases to be split between the two.

After his agreement to cooperate with the law enforcement officers, Settles allowed law enforcement agents to monitor telephone conversations with Whisner and Fluhr in which Settles arranged for surveillance of the deliveries of the cocaine obtained during the February 1988 trip. In the presence of government agents, Settles removed and packaged from the eleven ounces seized upon his arrest four one-ounce quantities for delivery to Fluhr, Whisner and Fluhr's girlfriend, Linda Susan Gross. The government retained the remaining seven ounces as well as a sample from each of the four one-ounce packages. The deliveries were to take place together at Settles' Indianapolis residence which was searched and equipped with listening devices. Government agents listened as Settles, Fluhr, Gross and King used some of the cocaine. Following the deliveries, Fluhr, Gross and Whisner were arrested upon leaving Settles' residence, the four ounces of cocaine were recovered and the three were eventually charged along with Settles in a five-count indictment. The indictment was comprised of one count of conspiracy to import cocaine into the United States, two counts of cocaine possession, and two counts of carrying a firearm during the commission of a drug-trafficking offense under 18 U.S.C. § 924(c),[2] and the case was consolidated with this case for trial on May 24, 1988.

The investigation into Settles' source in the Bahamas continued with his placing consensually monitored and recorded telephone calls to the telephone number he identified as that of his source, "Algie". The telephone number was registered to Richard Algie Missick of 55 Fleming Road, Freeport, Bahamas. Settles also provided the government with the recordings of incoming telephone calls and messages received at his residence.

Settles placed the first such call on March 7, 1988, to the telephone number registered to Missick. During this conversation, Settles and the defendant discussed the market price of hashish and the success of the cocaine sales from the quantity Settles purchased from Missick.

On April 14, 1988, Missick left two messages on Settles' answering machine and eventually held a conversation with Settles. Missick indicated in the conversation that he wished to "check Settles", which Settles testified to mean that Missick wished to check out Indianapolis before delivering a large quantity of cocaine. Missick inquired

---

1. Settles entered into an agreement with the government in which he pled guilty to conspiracy to import cocaine into the United States in return for the government's recommendation that he receive a sentence of imprisonment for two years or less.

2. *United States v. Robert Jason Settles, et al.*, Cause Number IP 88–33–CR.

as to the market price for an "O" or ounce of cocaine to which Settles responded the price was between $900 and $2,000.

Two more conversations between Settles and Missick transpired and were recorded on April 16, 1988. During those conversations, Missick inquired as to how long it would take to drive from Cincinnati to Indianapolis and that he would bring a Peruvian "Oz" with him. Settles testified that a Peruvian "Oz" referred to an ounce of high quality cocaine.

Settles and Missick eventually arranged to meet in Covington, Kentucky, on April 17, 1988, and to travel to Indianapolis. Settles was fitted with a body recorder and transmitter and supplied with a rental car to meet Missick at his hotel. Agents listened as Settles met Missick and a female, and then as Missick pulled a one-ounce package of cocaine from behind a soda machine near his hotel room while advising Settles never to store the cocaine in the same place he stayed. Settles, Missick and the woman then proceeded in the rental car toward Indianapolis. During the drive, a discussion between Settles and Missick about their prior and future transactions, including a reference to "Sleepy", was recorded. Near Greensburg, Indiana, their car was stopped by drug enforcement agents and Missick was placed under arrest. A search of the car revealed a one-ounce package of cocaine to the left of Missick's seat, where Settles testified Missick had attempted to hide it when the car was stopped. The arresting agent also found in Missick's wallet a business card containing Settles' phone number. All of the above-recorded messages and conversations were played for the jury.

### A.

At the outset, Missick contends that the government failed to establish that the eleven ounces of cocaine seized from Settles upon his arrest were sold to him by Missick, a necessary element to sustain the charge of conspiracy to import cocaine. In a related argument, Missick proposes that as a matter of law, Settles' testimony should be given no weight since, among other things, Settles is an admitted drug user, sporadically employed, and cooperated with the government in this investigation in exchange for a lenient sentencing recommendation.

It is well established that a conspirator need not know all of the members or details of a conspiracy to be held responsible as a co-conspirator. *Blumenthal v. United States*, 332 U.S. 539, 556, 68 S.Ct. 248, 256, 92 L.Ed. 154. The government need only prove the existence of a conspiracy and a participatory link with the defendant. *United States v. Dalzotto*, 603 F.2d 642, 645 (7th Cir.1979), certiorari denied, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425.

Read in the light most favorable to the government, the evidence clearly reveals a conspiracy between Fluhr, Whisner and Settles to import cocaine into the United States. Fluhr and Whisner provided Settles with money in advance of each trip to the Bahamas in return for the delivery of specified quantities of cocaine. As revealed by the recorded telephone conversations, Missick was aware of the conspiracy to import the cocaine into the United States for further distribution and the success of the sale of the imported quantities. Missick and Settles also discussed importing larger shipments of cocaine into the United States as well. It is not necessary that the defendant knew of the identities of Fluhr and Whisner, but sufficient that Missick knew that there were further participants in the distribution chain beyond Settles.

Defendant contends that the government failed to establish that the eleven ounces seized from Settles upon his arrest in February of 1988 were purchased from Missick. The government's forensic analytic chemist testified that the composition of the approximately eleven ounces seized from Settles, as well as the one ounce obtained from Missick on February 17, 1988, was L cocaine hydrochloride. Defendant urges that because the samples tested from the eleven ounces varied in purity and color, the government failed to prove that the eleven ounces of cocaine seized from Settles were derived from the

single source of Missick. This observation is without merit since the cocaine was tested after its controlled delivery by Settles to Fluhr, Gross and Whisner. As reflected in the recorded conversation during Settles' delivery of the cocaine, the cocaine was cut and a portion was consumed by Settles, Gross, Fluhr and King at Settles' residence. The four ounces of cocaine packaged by Settles for the controlled deliveries were recovered from Gross and Whisner as they left Settles' residence. It is reasonable that the jury could attribute the variations in purity and color among samples to the consumption process rather than the derivation of the cocaine from multiple sources.

█ Defendant's argument that Settles' testimony should not be given any weight as a matter of law because Settles was an admitted drug user, lacked regular employment and was cooperating with the government's investigation lacks merit as well. Issues of credibility are questions for the trier of fact. *United States v. Wheadon*, 794 F.2d 1277, 1281 (7th Cir.1986), certiorari denied, 479 U.S. 1093, 107 S.Ct. 1307, 94 L.Ed.2d 161. Settles' testimony regarding his trips to the Bahamas was independently corroborated by his travel calendars, flight manifests reviewed by Special Agent Dill and testimony from Ms. Cindy Weir, a representative of the agency which booked the last three of Settles' trips. Further, the recorded telephone conversations between Missick and Settles included discussion by Missick of prior and future dealings with Settles. Settles' testimony was without doubt sufficiently corroborated to allow the jury to consider its content together with Settles' demeanor in open court in reaching its verdict.

## B.

Defendant's second ground for appeal concerns whether the district judge erred in admitting tape recordings of conversations between Missick and Settles made with Settles' consent. Defendant offers the convoluted argument that the tape recordings were improperly made without authorization of the Bahamian government in violation of the Foreign Intelligence Surveillance Act of 1978 ("FISA"), 50 U.S.C. § 1801, *et seq.*, and 18 U.S.C. § 2511(2)(a)(ii) [3] and erroneously admitted into evidence in violation of 18 U.S.C. § 2515.[4] Defendant does not dispute the fact that the tape recordings were made with the express consent of Settles.

Defendant asserts that the tape recordings made by the government are subject to the provisions of 18 U.S.C. § 2511(2)(f) which provides:

> Nothing contained in this chapter [119] or chapter 121, or section 705 of the Communications Act of 1934, shall be deemed to affect the acquisition by the United States Government of foreign intelligence information from international

---

3. 18 U.S.C. § 2511(2)(a)(ii) provides: Notwithstanding any other law, providers of wire or electronic communication service, their officers, employees, and agents, landlords, custodians, or other persons, are authorized to provide information, facilities, or technical assistance to persons authorized by law to intercept wire, oral or electronic communications or to conduct electronic surveillance, as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, if such provider, its officers, employees, or agents, landlord, custodian, or other specified person, has been provided with—

> (A) a court order directing such assistance signed by the authorizing judge, or

> (B) a certification in writing by a person specified in section 2518(7) of this title or the Attorney General of the United States that no warrant or court order is required by law, that all statutory requirements have been met, and that the specified assistance is required.

Since, as discussed *infra,* the government recorded the conversations with the permission of Settles, a party to the conversations, this section requiring a court order or certification to authorize technical assistance in the interception of communication is inapplicable.

4. 18 U.S.C. § 2515 provides:

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter [119].

or foreign communications, or foreign intelligence activities conducted in accordance with otherwise applicable Federal law involving a foreign electronic communications system, utilizing a means other than electronic surveillance as defined in section 101 of the Foreign Intelligence Surveillance Act of 1978, and procedures in this chapter and the Foreign Intelligence Surveillance Act of 1978 shall be the exclusive means by which electronic surveillance, as defined in section 101 of such Act, and the interception of domestic wire and oral communications may be conducted.

This section provides that it does not affect the acquisition of foreign intelligence when utilizing a means other than electronic surveillance as defined in 50 U.S.C. § 1801(f) (see n. 5 *infra*). Further, Chapter 119 and FISA are the exclusive means by which electronic surveillance and the interception of domestic wire and oral communications may be conducted. The government does not dispute the application of this section to the tape recordings at issue, but asserts that the tape recordings were properly made pursuant to Chapter 119 and that FISA does not apply to the recordings here.

■ Defendant fails to elaborate in his brief before this Court the basis for applying FISA to the tape recordings at issue other than the fact that Missick was a Bahamian citizen. However, in his motion to suppress, defendant asserted that the tape recording of telephone conversations with Missick must comply with FISA because the recordings fall within the definition of "electronic surveillance" contained in 50 U.S.C. § 1801(f) [5] and the defendant is an "agent of a foreign power" as defined in 50 U.S.C. § 1801(b). Although defendant fails to complete the argument, he apparently means to assert that as required under FISA the government must secure a court order to conduct such tape recordings under Section 1804 of FISA or demonstrate that an exception to the court order requirement exists under Section 1802 of FISA. However, a court order under FISA is necessary only for "electronic surveillance" of a "foreign power" or "agent of a foreign power". The tape recordings made by the government pursuant to Settles' consent do not fall within any of the four definitions of "electronic surveillance". The first, third and fourth of the definitions in 50 U.S.C. § 1801(f) refer to surveillance methods which would require a warrant for law enforcement purposes. Obviously a warrant would not be required in this case since Settles as a party to the conversations gave his consent to their recording. *United States v. Horton*, 601 F.2d 319, 320 (7th Cir.1979), certiorari denied, 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed. 2d 197; *United States v. Craig*, 573 F.2d 455, 474 (7th Cir.1977), certiorari denied, 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110. The second definition is also inapplicable since it covers the situation where the surveillance is performed without the consent of any party thereto. Neither can Missick be categorized as an "agent of a foreign power" under Section 1801(b) which refers to someone who acts on behalf of a foreign

---

**5.** 50 U.S.C. § 1801(f) provides:

"Electronic surveillance" means—

(1) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire or radio communication sent by or intended to be received by a particular, known United States person who is in the United States, if the contents are acquired by intentionally targeting that United States person, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes; (2) the acquisition by an electronic, mechanical, or other surveillance device of the contents of any wire communication to or from a person in the United States, without the consent of any party thereto, if such acquisition occurs in the United States; (3) the intentional acquisition by an electronic, mechanical, or other surveillance device of the contents of any radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes, and if both the sender and all intended recipients are located within the United States; or (4) the installation or use of an electronic, mechanical, or other surveillance device in the United States for monitoring to acquire information, other than from a wire or radio communication, under circumstances in which a person has a reasonable expectation of privacy and a warrant would be required for law enforcement purposes.

power; no such evidence was presented. Clearly, FISA does not comprehend the consensual recording of defendant's conversations with Settles.

Since electronic surveillance and interception of wire or oral communications may only be conducted pursuant to FISA or Chapter 119, we next examine whether the recordings are lawful under Chapter 119. The government's conduct is explicitly permitted under 18 U.S.C. § 2511(2)(c) which provides:

> It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interpretation.

Furthermore, Section 2511(2)(d) provides:

> It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

The district court did not err in denying defendant's baseless motion to suppress the consensually recorded telephone conversations with the defendant. Special Agent Dill who participated in the tape recording of the conversations between Settles and Missick was doing so under color of law and with Settles' consent. Defendant's assertion that Special Agent Dill was not acting under color of law is worthless in light of subsection (d) of Section 2511(2) which allows recording by persons not acting under color of law if one of the conversing parties has given prior consent and the recording is not made for the purpose of violating any other law.

6. The pertinent guidelines are appended herein.

## C.

As a final matter, defendant argues that the district judge committed error in departing from the recommended Sentencing Guidelines pursuant to Chapter 227 of the Criminal Code.[6] Pursuant to Count One of the indictment, Missick was found guilty of a level 20 offense under the Guidelines which provides for an imprisonment range of 33 to 41 months. The statutory maximum for such an offense is twenty years imprisonment. At the sentencing hearing, the government asked the court to impose a sentence within the Guidelines. Judge Tinder, however, imposed a sentence of ninety-six months for Count One, justifying the departure from the Guidelines based on the possession of weapons by Whisner and Fluhr which he felt was not adequately addressed by the Guidelines.

Section 3553(b) of the same chapter of the Criminal Code provides that the sentence recommended by the guidelines should be imposed unless the trial court "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission...." The district judge's departure from the Guidelines on the basis of a factor addressed by the Commission is inappropriate "where the applicable guidelines, specific offense characteristics, and adjustments do take into consideration a factor listed in this part, departure from the guideline is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense conviction." Section 5K2.0 of the Sentencing Guidelines.

Upon review, this Court must determine whether the sentence:

> (1) was imposed in violation of law;
> (2) was imposed as a result of an incorrect application of the sentencing guidelines;
> (3) is outside the range of the applicable sentencing guideline, and is *unreasonable*, having regard for—

(A) the factors to be considered in imposing a sentence, as set forth in chapter 227 of this title; and

(B) the reasons for the imposition of the particular sentence, as stated by the district court pursuant to the provisions of section 3553(c); or

(4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable.

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous. (Emphasis added.)

18 U.S.C. § 3742(d). The sentence imposed on Missick is not in violation of law since it is within the statutory maximum. Missick does not contend that Judge Tinder engaged in an incorrect application of the Sentencing Guidelines. Therefore, the only question for this Court is whether the sentence, although outside the range of the applicable Sentencing Guidelines, is unreasonable under the above-quoted 18 U.S.C. § 3742(d)(3).

■ Judge Tinder departed from the Sentencing Guidelines because in his opinion, in promulgating the Guidelines, the Sentencing Commission did not adequately consider the situation where a defendant charged with trafficking a controlled substance supplies the drugs to persons possessing firearms. Because Fluhr and Whisner were subject to a minimum imprisonment of five years due to their possession of weapons in the commission of their offense, Judge Tinder reasoned that Missick should be subject to a greater sentence as the supplier of drugs. In Judge Tinder's words: "[t]he danger that is created begins with the importation and is compounded by those who receive it. If those who receive it are armed and can get no less than five years in prison [pursuant to 18 U.S.C. § 924(c)], the person [Missick] who ships it into this country through the intermediary of Mr. Settles is responsible even more than they are." Sentencing Tr. 47–49.

Although this Court is required to accord great deference to a district judge's imposition of sentence, Judge Tinder's departure from the Sentencing Guidelines was unreasonable in light of the factors considered by the Sentencing Commission. Possession of a firearm during the commission of a drug transaction of the amount involved here is certainly not an uncommon occurrence. The Sentencing Commission recognized the aggravating nature of possession of firearms in the course of drug trafficking by providing for a two-level enhancement of the offense under Section 2D1.1(b)(1) of the Guidelines when this specific offense characteristic is present:

If a firearm or other dangerous weapon was possessed during commission of the offense, increase by 2 levels.

See also Section 5K2.6.

If Missick had possessed a firearm during the drug offense, it would have been proper for the district judge to sentence Missick within the level 22 range, 41–51 months. However, Judge Tinder's explanation for his departure from the Guidelines was predicated upon firearm possession by Whisner and Fluhr, the recipients of the fruits of Missick's importation. Although Whisner and Fluhr were charged under 18 U.S.C. § 924(c) for the possession or use of a firearm during the commission of a drug-trafficking crime subjecting them to an additional five years of imprisonment, no evidence was presented that Missick possessed a firearm during the commission of the offense. Missick may still have been properly subject to an enhanced sentence based on the possession of firearms by Whisner and Fluhr without individually possessing a firearm under the theory of co-conspirator liability established in *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489.[7] In order to do

---

7. Defendant argues that the sentence enhancement of 18 U.S.C. § 924(c) is inconsistent with the sentence enhancement for Section 2D1.1(b)(1) of the Guidelines. Section 2K2.4 of the Guidelines avoids any potential for double sentencing for the use or possession of a weapon in a drug-trafficking crime to which both Section 2D1.1(b)(1) and Section 924(c) could apply, by providing that when a sentence under Section 924(c) is imposed in conjunction with a sen-

so, Whisner, Fluhr and Missick must have been charged as co-conspirators in the conspiracy to import cocaine under Count One of Missick's indictment, Whisner or Fluhr must have been found possessing a firearm in furtherance of the conspiracy, and Missick must have been found to be a member of the conspiracy at the time of the firearm possession. *United States v. Gironda*, 758 F.2d 1201, 1211 (7th Cir.1985). However, Count One of Missick's indictment charged only Settles and "diverse other persons known and unknown" in the conspiracy to import.

In establishing the Sentencing Guidelines, the Commission sought to devise a "charge offense" system, where the defendant is sentenced on the basis of the conduct charged and convicted, rather than a "real offense" system where the defendant may be sentenced on the actual conduct independently of whether the conduct constituted elements of the charged offense. Sentencing Guidelines, Chap. One, Part A, § 4(a), at 1.5 (1987). However, the Guidelines retain some real offense attributes, including the specific offense characteristics which allow the district court to reduce or elevate the offense level based on individual characteristics of the defendant, such as possession of a dangerous weapon.

Here the specific offense characteristic of possession of a firearm by Missick was not present to justify elevating the offense level from 20 to 22 and Missick was not charged as a co-conspirator with Whisner and Fluhr who were charged with possession of firearms. Therefore, sentencing Missick for firearm possession by Whisner and Fluhr is clearly inconsistent with the Sentencing Commission's intent to impose sentence based on the charged offense only.

## II.

The district judge erred in departing from the sentencing guidelines and sentence for an underlying offense, "any specific offense characteristic for firearm discharge, use, or possession is not applied in respect to such underlying offense." Accordingly, if an additional five-year sentence for Section 924(c)

tencing the defendant for conduct not contained in the charged offense and which was adequately considered by the Sentencing Commission as a specific offense characteristic under Section 2D1.1(b)(1) of the Guidelines. Therefore, the defendant's conviction is affirmed, but the cause is remanded for resentencing of the defendant consistently with the Sentencing Guidelines.

## APPENDIX

### PART D—OFFENSES INVOLVING DRUGS

§ 2D1.1 **Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses)**

(a) Base Offense Level:

(1) 43, for an offense that results in death or serious bodily injury with a prior conviction for a similar drug offense; or

(2) 38, for an offense that results in death or serious bodily injury and involved controlled substances (except Schedule III, IV, and V controlled substances and less than: (A) fifty kilograms of marijuana, (B) ten kilograms of hashish, and (C) one kilogram of hashish oil); or

(3) For any other offense, the base offense level is the level specified in the Drug Quantity Table below.

(b) Specific Offense Characteristic

(1) If a firearm or other dangerous weapon was possessed during commission of the offense, increase by 2 levels.

§ 2K2.4 **Use of Firearms or Armor–Piercing Ammunition During or in Relation to Certain Crimes**

If the defendant, whether or not convicted of another crime, was convicted under 18 U.S.C. § 924(c) or § 929(a), the penalties are those required by statute.

possession or use of a weapon were imposed in addition to a sentence for the underlying offense of drug trafficking, Section 2D1.1(b)(1) could not be used to raise the level of the underlying offense two levels.

*Commentary*

*Statutory Provisions:* 18 U.S.C. §§ 924(c), 929(a).

*Application Notes:*

1. In each case, the statute requires a term of imprisonment imposed under this section to run consecutively to any other term of imprisonment.

2. Where a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for the possession, use, or discharge of a firearm (*e.g.,* § 2B3.1(b)(2) (Robbery)), is not to be applied in respect to the guideline for the underlying offense.

*Background:* 18 U.S.C. §§ 924(c) and 929(a) provide mandatory minimum penalties for the conduct proscribed. To avoid double counting, when a sentence under this section is imposed in conjunction with a sentence for an underlying offense, any specific offense characteristic for firearm discharge, use, or possession is not applied in respect to such underlying offense.

§ 5K2.0 **Grounds for Departure** (Policy Statement)

Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that an aggravating or mitigating circumstance exists that was not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the court at the time of sentencing. Nonetheless, the present section seeks to aid the court by identifying some of the factors that the Commission has not been able to fully take into account in formulating precise guidelines. Any case may involve factors in addition to those identified that have not been given adequate consideration by the Commission. Presence of any such factor may warrant departure from the guidelines, under some circumstances, in the discretion of the sentencing judge. Similarly,

the court may depart from the guidelines, even though the reason for departure is listed elsewhere in the guidelines (*e.g.,* as an adjustment or specific offense characteristic), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate.

Where the applicable guidelines, specific offense characteristics, and adjustments do take into consideration a factor listed in this part, departure from the guideline is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense of conviction. Thus, disruption of a governmental function, § 5K2.7, would have to be quite serious to warrant departure from the guidelines when the offense of conviction is bribery or obstruction of justice. When the offense of conviction is theft, however, and when the theft caused disruption of a governmental function, departure from the applicable guideline more readily would be appropriate. Similarly, physical injury would not warrant departure from the guidelines when the offense of conviction is robbery because the robbery guideline includes a specific sentence adjustment based on the extent of any injury. However, because the robbery guideline does not deal with injury to more than one victim, departure would be warranted if several persons were injured.

Also, a factor may be listed as a specific offense characteristic under one guideline but not under all guidelines. Simply because it was not listed does not mean that there may not be circumstances when that factor would be relevant to sentencing. For example, the use of a weapon has been listed as a specific offense characteristic under many guidelines, but not under immigration violations. Therefore, if a weapon is a relevant factor to sentencing for an immigration violation, the court may depart for this reason.

Harms identified as a possible basis for departure from the guidelines should be taken into account only when they are rele-

vant to the offense of conviction, within the limitations set forth in § 1B1.3.

§ 5K2.6 **Weapons and Dangerous Instrumentalities** (Policy Statement)

If a weapon or dangerous instrumentality was used or possessed in the commission of the offense the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others. The discharge of a firearm might warrant a substantial sentence increase.